IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-cv-61241-RUIZ

APRIL HICKS,

    Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

    Defendant.
_____/

THE UNITED STATES OF AMERICA,

    Counterclaim Plaintiff,

vs.

APRIL HICKS,

    Counterclaim Defendant.
_____/

DEPOSITION OF TYRONE EUGENE HILTON

TAKEN ON BEHALF OF THE PLAINTIFF

APRIL 5, 2021
10:02 A.M. TO 2:41 P.M.

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23

STENOGRAPHICALLY REPORTER BY:
JAIME DE FRANCESCHI
FLORIDA PROFESSIONAL REPORTER



877.291.3376
www.UCRinc.com

Hilton, Tyrone Eugene 04-05-2021          Page 2 of 131

```
 1              APPEARANCES OF COUNSEL

 2  ON BEHALF OF THE PLAINTIFF:

 3      MATTHEW S. TUCKER, ESQUIRE
        TUCKER LAW
 4      200 SE 6TH STREET, SUITE 405
        FORT LAUDERDALE, FL 33301
 5      954.204.0444
        Matt@TuckerUp.com
 6       (REMOTELY VIA ZOOM)

 7  ON BEHALF OF THE DEFENDANT:

 8      MONICA L. HADDAD FORBES, ESQUIRE
        ASSISTANT UNITED STATES ATTORNEY
 9      U.S. ATTORNEY'S OFFICE
        SOUTHERN DISTRICT OF FLORIDA
10      500 S. AUSTRALIAN AVENUE, SUITE 400
        WEST PALM BEACH, FL 33401
11      561.209.1004
        monica.forbes@usdoj.gov
12       (REMOTELY VIA ZOOM)

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1              DEPOSITION OF TYRONE EUGENE HILTON
 2                       APRIL 5, 2021
 3         THE COURT REPORTER:  We are now on the record
 4    in the matter of April Hicks v. United States of
 5    America; and the United States of America v. April
 6    Hicks, Case No. 20-cv-61241.  The date is April 5,
 7    2021, and the time is 10:02 a.m. Would counsel
 8    state their appearances for the record and
 9    stipulate to the swearing in of the witness
10    remotely?
11         MR. TUCKER:  Matthew Tucker on behalf of the
12    Plaintiff, April Hicks.
13         MS. FORBES:  Monica Haddad Forbes, Assistant
14    United States Attorney for the Southern District of
15    Florida on behalf of the Defendant, United States
16    of America.
17         THE COURT REPORTER:  Please raise your right
18    hand, Mr. Hilton.  Do you swear or affirm that
19    the testimony you are about to give will be the
20    truth, the whole truth, and nothing but the
21    truth?
22         THE WITNESS:  Yes.
23 Thereupon:
24                  TYRONE EUGENE HILTON
25 having been first duly sworn, testified as follows:
```



```
 1   neighborhood, right, because it's a main street?
 2          MS. FORBES:  Object to form.
 3          THE WITNESS:  It's a main street.  No, it's
 4      not a side street.
 5   BY MR. TUCKER:
 6      Q.   And does the house at -- I believe it's --
 7   well, let me ask you this:  Would you recognize the
 8   house where you delivered the package if I showed you?
 9      A.   No, sir, I probably wouldn't.
10      Q.   Okay.  So you pull up to a house to deliver a
11   package right before the crash.  Fair?
12      A.   Yes.
13      Q.   And it's on this main, four lane street.
14   Right?
15      A.   Yes.
16      Q.   Do you stop in the middle of the road?
17          MS. FORBES:  Object to form.
18          THE WITNESS:  No.  There's a bike lane.
19   BY MR. TUCKER:
20      Q.   Okay.  Did you park in the bike lane?
21      A.   Yes.
22      Q.   Is any of your car sticking out into the lane
23   of travel or did you park on the sidewalk?
24          MS. FORBES:  Object to form.
25          THE WITNESS:  I know I didn't park on the
```



1       sidewalk, no.  We're not supposed to do that.
2  BY MR. TUCKER:
3       Q.   Well, what are you supposed to do on a main
4  street when you have to stop to deliver mail?
5       A.   Well, you get as close -- park in the bike
6  lane, put your flashers on and your e-brake; and you get
7  out and deliver the package.
8       Q.   Have you received training with the USPS on
9  how to drive their trucks?
10      A.   Yes.
11      Q.   And the training tells you to not park on
12 sidewalks?
13           MS. FORBES:  Object to form.
14           THE WITNESS:  I'm not sure of that part. But
15      it's just common knowledge to not park on the
16      sidewalk because there's people walking.
17 BY MR. TUCKER:
18      Q.   Well, what have you been trained to do by the
19 United States Post Office when you stop at a busy main
20 road?
21      A.   Exactly what I did.  Stay in the bike lane and
22 get as far to the curb as you can, turn your wheels,
23 pull your emergency brake up and put your flashers on,
24 and get out and deliver the package.
25      Q.   Are you allowed to pull into somebody's



```
 1       Q.   And the bike lane is not big enough for your
 2  entire truck.  Is that fair?
 3       A.   It sticks out a bit.
 4       Q.   It sticks out a bit into the main roadway.
 5  Correct?
 6            MS. FORBES:  Object to form.
 7            THE WITNESS:  Yes.  Correct.
 8  BY MR. TUCKER:
 9       Q.   And so at the time just before the crash your
10  vehicle was stopped on a main, busy road, sticking out
11  into the rightmost lane.  Fair?
12       A.   The furthest to the right, toward the
13  sidewalk, yes, sir.
14       Q.   Were you parked directly in front of that
15  person's driveway or where were you parked when you were
16  going to deliver that package?
17            MS. FORBES:  Object to form.
18            THE WITNESS:  I don't recall if I was directly
19       in front or whatnot.  I don't recall.
20  BY MR. TUCKER:
21       Q.   Okay. Well, so you stop at the house, whatever
22  house that may be, just before the crash, and you get
23  out and deliver a package?
24       A.   Yes.
25       Q.   Was it just one package that you delivered
```



```
 1        A.    Yes.
 2        Q.    What happens next?
 3        A.    I check my mirrors -- or I put my seat belt on
 4   first and I check my mirrors.  And as I'm checking my
 5   mirrors, I see this car coming and I'm like it's not
 6   stopping.  Like the car is not stopping.  So I already
 7   had everything set.  I didn't even move my emergency
 8   brake because that would have made everything worse.
 9   And my flashers was on so I just held on and took a hit.
10        Q.    And when you took this hit, did your vehicle
11   move?
12        A.    Yes.  It moved up to the spot where you see me
13   turned.
14        Q.    You're saying it moved all the way up to where
15   we can see in Exhibit 2.  Right?
16        A.    Exactly.
17              MS. FORBES:  Form.
18              THE WITNESS:  Well, whichever one it was.
19   BY MR. TUCKER:
20        Q.    And were there any tire marks on the ground
21   from your vehicle?
22        A.    Yes, there were.  That's what saved me, the
23   emergency brake.  That's how they knew it wasn't my
24   fault.
25        Q.    And when you say the emergency brake, so had
```



```
 1  you taken off your emergency brake prior to the crash?
 2           MS. FORBES:  Object to form.
 3           THE WITNESS:  No.  I didn't have time to.
 4  BY MR. TUCKER:
 5      Q.   What did the tire marks on the ground look
 6  like?
 7      A.   They were black, like --
 8      Q.   Were there tire marks going from 412, all the
 9  way -- well, strike that.  Let me pull up the picture.
10           All right.  I'm showing you Exhibit 4. And we
11  made that blue line in the bike lane that shows where
12  your car stopped; were there tire marks all the way from
13  this blue line, all the way up to this next house where
14  we see the crash in Exhibit 2?
15      A.   Yes, sir.  I want to say yes.
16      Q.   And you saw them with your eyes?
17      A.   Yes.  And my supervisor took pictures.
18      Q.   Your supervisor took pictures of the track
19  marks?
20      A.   Yes.
21      Q.   You saw him do that?
22      A.   Yes.
23      Q.   Did you ever see the pictures of the track
24  marks?
25      A.   Yes.
```



1    Q.   Where did you see them?
2    A.   I had him send them to me.
3    Q.   So you actually have them?
4    A.   Yes.
5    Q.   Other than your vehicle and Ms. Hicks'
6  vehicle, did your vehicles come into contact with any
7  other objects?
8    A.   No, sir.
9    Q.   And you saw track marks from this blue line
10 all the way up until this next house where the fence
11 starts?
12        MS. FORBES:  Object to form.
13        THE WITNESS:  I'm not gonna say I'm sure that
14   I seen it all the way up to there, but there were
15   marks throughout, yeah, leading up to there, yes.
16 BY MR. TUCKER:
17   Q.   And you saw long track marks from this crash?
18   A.   Yes.  It was skid and some long ones, yes.
19   Q.   How long was the longest skid mark that you
20 saw?
21        MS. FORBES:  Object to form.
22        THE WITNESS:  I couldn't really recall that.
23 BY MR. TUCKER:
24   Q.   More than the length of a car?
25        MS. FORBES:  Object to form.



```
 1              THE WITNESS:  I'm not sure.  Once again, sir,
 2       I'm not sure.
 3  BY MR. TUCKER:
 4       Q.   You said that when you got back in your car
 5  just prior to the crash you put your seat belt on?
 6              MS. FORBES:  Object to form.
 7              THE WITNESS:  Yes.
 8  BY MR. TUCKER:
 9       Q.   Had you put the vehicle in drive at that
10  point?
11              MS. FORBES:  Object to form.
12              THE WITNESS:  No.  I did not get a chance to
13       turn the vehicle on.
14  BY MR. TUCKER:
15       Q.   You're saying your vehicle was off when the
16  crash occurred?
17       A.   Yes.  I never got a chance to turn the vehicle
18  on.
19       Q.   After the crash occurred, what happened?
20       A.   She got out of the car and ran around my truck
21  and banged on my window, asking me to roll it down to
22  see if I was okay and asked me what happened and, yeah,
23  then she went back to her vehicle.
24       Q.   She just said "What happened?"
25       A.   Yeah.  She said "What happened?  Were you
```



Hilton, Tyrone Eugene  04-05-2021          Page 52 of 131

1  trying to make a U-turn?  What were you trying to do?  I
2  don't know what happened."  And I just stared at her
3  like uh, okay.
4       Q.   You didn't say anything back?
5       A.   No.  I didn't say anything back.
6       Q.   Why not?
7       A.   I don't think I had anything good to say to
8  her.
9       Q.   Why is that?
10      A.   It just wasn't a good time for me to speak to
11 her on anything because of what she just did.
12      Q.   Well, what do you say that she did?
13      A.   You ran into a parked vehicle and you totaled
14 your car from the front, so I mean there were other
15 vehicles passing me on the street the same time she did
16 it, so it's like I can't give you a pass.  I don't have
17 anything nice to say to you so I'm not going to say
18 anything to you.
19      Q.   What lane was she in just prior to the crash?
20      A.   She was in the right lane.  The same lane that
21 I was halfway in.
22      Q.   Do you know what her speed was?
23           MS. FORBES:  Object to form.
24           THE WITNESS:  No, sir.
25 BY MR. TUCKER:



```
 1      Q.   Was your door open at the time of the crash?
 2      A.   No, sir.
 3      Q.   It was closed?
 4      A.   Yes, sir.
 5      Q.   How many impacts were there to your vehicle?
 6           MS. FORBES:  Object to form.
 7           THE WITNESS:  Excuse me?
 8  BY MR. TUCKER:
 9      Q.   How many impacts?  Was there a single impact
10  to your vehicle or was there more than one impact?
11      A.   There was just a single one.
12      Q.   Prior to the crash, just prior to the crash,
13  was your vehicle moving at all?
14      A.   No, sir.
15      Q.   When the crash occurred, your vehicle moved.
16  Is that fair?
17      A.   Yes.  That's fair to say.
18      Q.   Is it fair to say based on the picture that we
19  saw, that it moved about 10 to 15 feet?
20           MS. FORBES:  Object to form.
21           THE WITNESS:  I'm not sure on how far it
22      moved.
23  BY MR. TUCKER:
24      Q.   But we do know that it moved, from what you're
25  saying, from that blue line in Exhibit 4, all the way up
```



```
 1  accident.
 2      Q.   Do you wear glasses?
 3      A.   No, sir.
 4      Q.   Contact lenses?
 5      A.   No, sir.
 6      Q.   Any issues with your vision?
 7      A.   No, sir.
 8      Q.   What did you do before you worked for the
 9  USPS?
10      A.   I worked at Medline.  It's a medical company.
11      Q.   Any mechanical problems with your vehicle that
12  day prior to the crash?
13      A.   No, sir.
14      Q.   Did the vehicle you were in sustain any
15  damage?
16      A.   Was it damaged?
17      Q.   Correct.
18      A.   Prior to the accident or after?
19      Q.   Well, was it damaged prior to the crash?
20      A.   No, sir.
21      Q.   What about after the crash?
22      A.   Yes, sir.
23      Q.   Where was the damage to your vehicle?
24      A.   The back bumper and the side of the back tire,
25  the rim of it, like the circle where the tire is.
```



```
 1        Q.    Okay.  So the back, left side of the vehicle
 2   you were driving was damaged?
 3        A.    Yes, sir.  The bumper.  They have pictures and
 4   stuff like that, but I don't.
 5        Q.    And the bumper on that vehicle wraps around
 6   the left side of the vehicle.  Is that fair or unfair?
 7        A.    Yeah.  It wraps around both sides, pretty
 8   much.
 9        Q.    In other words, it covers the whole back part
10   of the vehicle, but it also comes up on the left and
11   right side of the vehicle too.  Yes or no?
12        A.    Yeah.  Just a little on the left and the
13   right, yes.
14        Q.    Did you inspect the damage after the crash?
15        A.    I looked at it, yeah, pretty much.  I looked
16   at it.
17        Q.    And what did you see?
18        A.    At that point, all I can see is her front --
19   the last picture you showed me, and just the damage on
20   the bumper, yes.
21        Q.    Let's talk about the training that you
22   received from the USPS.  What type of training have you
23   received related to driving vehicles for the United
24   States Post Office?
25        A.    Well, we're always supposed to check the truck
```



CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

    I, Jaime De Franceschi, Florida Professional Reporter and Notary Public, State of Florida, certify that TYRONE EUGENE HILTON remotely appeared before me on the 5th day of April, 2021, and was duly sworn.

    Signed this 19th day of April, 2021.

_____
JAIME DE FRANCESCHI
Notary Public, State of Florida
My Commission No.: GG 215231
Expires: May 07, 2022

```
 1                 CERTIFICATE OF REPORTER
 2   STATE OF FLORIDA
 3   COUNTY OF PALM BEACH
 4
 5        I, Jaime De Franceschi, Florida Professional
 6   Reporter, certify that I was authorized to and did
 7   stenographically report the Zoom videotaped deposition
 8   of TYRONE EUGENE HILTON; that a review of the transcript
 9   was requested; and that the transcript is a true record
10   of my stenographic notes.
11        I further certify that I am not a relative,
12   employee, attorney, or counsel of any of the parties,
13   nor am I a relative or employee of any of the parties'
14   attorneys or counsel connected with the action, nor am I
15   financially interested in the action.
16
17        DATED this 19th day of April, 2021.
18
19
20   _____
     JAIME DE FRANCESCHI, COURT REPORTER
21
22
23
24
25
```



ERRATA SHEET

I wish to make the following changes, for the following reasons:

| PAGE NO. | LINE NO. | | |
|---|---|---|---|
| 118 | 17 | CHANGE | "lose" instead of "love" |
| | | REASON | typographical error |
| ___ | ___ | CHANGE | ___ |
| | | REASON | ___ |
| ___ | ___ | CHANGE | ___ |
| | | REASON | ___ |
| ___ | ___ | CHANGE | ___ |
| | | REASON | ___ |
| ___ | ___ | CHANGE | ___ |
| | | REASON | ___ |
| ___ | ___ | CHANGE | ___ |
| | | REASON | ___ |
| ___ | ___ | CHANGE | ___ |
| | | REASON | ___ |
| ___ | ___ | CHANGE | ___ |
| | | REASON | ___ |
| ___ | ___ | CHANGE | ___ |
| | | REASON | ___ |



_____
SIGNATURE

5/4/2021
DATE